UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE


| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | NO. 2:07-CR-40 |
| | ) | |
| HERBERT S. MONCIER | ) | |


## MEMORANDUM OPINION AND ORDER


On August 9, 2005, Michael Vassar ("Vassar") was indicted by the federal grand jury on charges of possession of cocaine with intent to distribute, being a felon in possession of ammunition, and distribution of cocaine. [Case No. 2:05-CR-70]. Vassar was indicted on September 13, 2005, on charges of conspiracy to distribute and possess with the intent to distribute five (5) kilograms or more of cocaine and distribution of cocaine. [Case No. 2:05-CV-75]. Vassar was represented at the trial of both cases by attorney Herbert S. Moncier ("Moncier").

This matter is before the Court on the issue of the alleged criminal contempt of Moncier on November 17, 2006, during his representation of Vassar in case No. 2:05-CR-75. The contempt matter was tried before the Court without

intervention of a jury on April 24, 2007, and was taken under advisement for the purpose of making written findings of fact and conclusions of law.

**FACTUAL AND PROCEDURAL BACKGROUND**

On November 17, 2006, Michael Vassar was scheduled to be sentenced by this Court after his conviction by a jury in case No. 2:05-CR-75 of a conspiracy to distribute and to possess with the intent to distribute cocaine. At the beginning of the hearing, Moncier, after informing chambers of an emergency matter to be taken up, stated that he had been supplied with a letter from the United States on the prior day "purporting to be a Brady disclosure." Representing to the court that the letter raised a possible issue pursuant to Rule 44 (c), Moncier asked "to address the Court with the government present on the record in chambers . . ." [Doc. 680, p. 2] [1]

After the Court cleared the courtroom of all present except for Moncier and Vassar, the government agent and the Assistant United States Attorneys representing the United States and certain court personnel, Moncier

---

[1]   The disclosure involved the statement of an already convicted co-conspirator, whom Moncier had subpoenaed to testify at the sentencing hearing, which suggested that Vassar knew incriminating information about another of Moncier's clients, Harold Grooms, alleged to be an unindicted co-conspirator. Moncier argued that independent counsel should be appointed to advise Vassar concerning the possible conflict of interest on Moncier's part created by his representation of both Vassar and the unindicted co-conspirator. Moncier asserted that Vassar would not be candid with him about the matter because of the joint representation, thus the need for independent counsel.

moved for a continuance of the sentencing hearing and that the matter be presented

to another district judge and an independent attorney be appointed to advise Vassar

concerning the Rule 44 matter. After considerable argument, these requests were

denied.

Moncier then made various further attempts to postpone the

sentencing hearing, including a motion to withdraw as counsel for Vassar and then

to withdraw conditionally. These motions were then essentially withdrawn after

Moncier informed the Court that his client wished to go forward with the hearing

with Moncier representing him and that Vassar wished to address the Court . At

the end of a lengthy hearing, during the Court's questioning of Vassar, the

following occurred:

> **THE COURT**:    MR. VASSAR, HERE'S THE COURT'S
> CONCERN. WHEN WE HAVE THIS SENTENCING
> HEARING I WANT YOUR LAWYER TO ASK WHATEVER
> QUESTIONS ARE NECESSARY TO ASK TO ADEQUATELY
> PRESENT YOUR CASE TO THIS COURT. I DON'T WANT
> YOU REPRESENTED BY A LAWYER WHO IS RELUCTANT
> TO ASK QUESTIONS FOR – OUT OF CONCERN ABOUT
> WHAT THE ANSWERS MIGHT BE AS THEY RELATE TO
> HAROLD GROOMS. I DON'T WANT YOUR LAWYER TO
> BE IN A POSITION TO WHERE HE IS RELUCTANT TO
> CALL A WITNESS FOR FEAR THAT THE GOVERNMENT
> MIGHT ASK ABOUT HAROLD GROOMS AND HE DOESN'T
> KNOW WHAT THE WITNESS IS GOING TO SAY. YOU
> UNDERSTAND WHAT I'M SAYING?

> **MR. VASSAR**:    YES, SIR.

**THE COURT**: I WANT YOUR LAWYER'S LOYALTY TO BE TO YOU –

**MR. VASSAR**: THAT'S WHAT I WANT.

**THE COURT:** NOW, YOU UNDERSTAND HOW THOSE CONFLICTS CAN ARISE IN THE CONTEXT OF THIS CASE WITH MR. MONCIER REPRESENTING HAROLD GROOMS AND REPRESENTING YOU AT THE SAME TIME?

**MR. VASSAR**: I UNDERSTAND.

**THE COURT:** OKAY. IT'S A VERY SIMPLE QUESTION THEN, UNDERSTANDING HOW THOSE CONFLICTS CAN ARISE, DO YOU WANT MR. MONCIER TO CONTINUE REPRESENTING YOU IN THIS CASE OR DO YOU WANT ME TO SEE IF I CAN FIND SOMEBODY WHO HAS NO CONNECTION WITH ANY OTHER CODEFENDANT OR POTENTIAL CODEFENDANT IN THIS CASE?

**MR. MONCIER**: ONCE AGAIN, YOUR HONOR –

**THE COURT**: MR. MONCIER –

**MR. MONCIER**: HE MAKES –

**THE COURT**: MR. MONCIER, YOU BE QUIET.

**MR. MONCIER**: MAY I APPROACH THE BENCH?

**THE COURT**: YOU MAY STAND THERE AND DO WHAT I TOLD YOU TO DO UNTIL MR. VASSAR ANSWERS THIS QUESTION.

**MR. MONCIER**: FOR THE RECORD, YOUR HONOR, I OBJECT WITHOUT HIM HAVING –

**THE COURT**: MR. MONCIER, ONE MORE WORD AND YOU'RE GOING TO JAIL.

**MR. MONCIER**: MAY I SPEAK TO MY –

**THE COURT**: OFFICERS, TAKE HIM INTO CUSTODY.

WE'LL BE IN RECESS.

**APPLICABLE LAW**

Federal courts have inherent powers necessary for them to function as an institution. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991). "Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates." *Id.* (quoting *Anderson v. Dunn,* 6 Wheat. 204, 227, 5 L. Ed. 242 (1821)).

"Criminal contempt is a crime in the ordinary sense," *Bloom v. Illinois*, 391 U.S. 194, 201, 88 S. Ct. 1477, 1481, 20 L. Ed. 2d 522 (1968), and must be proven beyond a reasonable doubt. *Gompers v. Buck's Stove & Range Company*, 221 U.S. 418, 444, 31 S. Ct. 492, 499, 55 L. Ed. 797 (1911). The judicial contempt power, however, should be exercised with restraint and discretion. *Railroad Express, Inc. v. Piper*, 447 U.S. 752, 764, 100 S. Ct. 2455, 65 L. Ed. 2d 488 (1980). The traditional power of a court to punish contempt is codified at 18 *U.S.C.* § 401, which provides as follows:

> A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as –
>
> > 1. Misbehavior of any person in its

presence or so near thereto as to obstruct the administration of justice;

2.     Misbehavior of any of its officers in their official transactions;

3.     Disobedience or resistence to its lawful writ, process, order, rule, decree, or command.

In order to support a conviction for criminal contempt under § 401(1), the record must establish, beyond a reasonable doubt, the existence of four (4) elements.  First, there must be evidence that the defendant engaged in some conduct that can be considered "misbehavior."  *See Vaughn v. City of Flint*, 752 F. 2d 1160, 1167 (6th Cir. 1985).   Second, that misbehavior must amount to an "obstruction of the administration of justice," *see id.*, an obstruction that "must be . . . actual, not . . .theoretical . . . ."  *See id. at 1168 (citing In re McConnell*, 370 U.S. 230, 234, 82 S. Ct. 1288, 8 L. Ed. 2d 434 (1962)).   Third, the contempt must occur in the presence of the judge imposing the summary determination of criminal guilt.[2]  *See id.* at 1167.   Finally, the defendant must have formed an actual intent to cause the obstruction of justice.  *See Id.*   Thus, the improper act must be "a deliberate or intended violation, as distinguished from an accidental, inadvertent or negligent

---

[2]   The record in this case may have provided an adequate basis for summary disposition on November 17 pursuant to Fed. R. Crim. P. 42(b); however, at the request of Moncier's counsel that the Court not do so, the Court chose to proceed after notice to Moncier, the appointment of a prosecutor and a trial after giving Moncier a reasonable time to prepare a defense.  Rule 42(a).

violation." *Id.* at 1169 (quoting *TWM Manufacturing Company v. Dura Corp.*, 722 F. 2d 1261, 1272 (6th Cir. 1983)).

Section 401(3), on the other hand, requires proof beyond a reasonable doubt of (1) resistence or disobedience to the court's "writ, process, order, rule or command," and (2) the act of resistence or disobedience must be "a deliberate or intended violation, as distinguished from an accidental, inadvertent or negligent violation." *In re Chandler*, 906 F. 2d 248, 250 (6th Cir. 1990) (quoting *TMW Manufacturing Company,* 722 F. 2d at 1272). The second requirement may be "inferred if a lawyer's conduct discloses a reckless disregard for his professional duty." *U. S. v. Delahanty*, 488 F. 2d 396, 398 (6th Cir. 1973).

Section 401(3), in contrast to § 401(1), requires no finding of obstruction of justice. Section 401(1) is predicated on "misbehavior" rather than the violation of an express order. *United States v. Galin*, 222 F. 3d 1123 (9th Cir. 2000). Also, the wisdom, fairness or correctness of a court's order is not at issue. "If a person to whom a court directs an order believes that order is incorrect the remedy is to appeal, but, absent a stay, he must comply promptly with the order pending appeal." *Maness v. Meyers*, 419 U.S. 449, 458, 95 S. Ct. 584, 42 L. Ed. 2d 574 (1975).

# ANALYSIS, FINDINGS OF FACT AND CONCLUSIONS OF LAW

Criminal contempt of court is a very serious matter and, when the alleged contempt involves the conduct of an attorney appearing before the court, even more serious. In addition, the decision whether a criminal defense lawyer's actions are contemptuous requires this Court to balance two very important considerations – – the lawyer's duty to represent a criminal defendant vigorously and zealously and the court's duty to administer justice in an orderly and efficient fashion without contumacious interference by a misbehaving attorney. This balancing of policy considerations becomes even more difficult when dealing with a lawyer like Moncier, an attorney who by his own admission "pushes the envelope" [3] and who is described by his own attorney as a lawyer who will pursue every issue "to the line." [4]

Also important to this Court in determining the issues raised by this matter is the context in which the incident of November 17, 2006, occurred. It is unlikely that this Court, and most other courts, would have taken the extraordinary step of citing Moncier for contempt if the incident of November 17 had been an

---

[3] The role of a trial attorney representing a criminal defendant is necessarily contentious, made so by the adversary nature of a criminal proceeding. A criminal attorney nevertheless has a duty to conduct himself in a professional and dignified manner.

[4] Presumably the line between zealous advocacy and contemptuous conduct.

isolated one. [5]  It was not, however.   The transcript of the November 17 hearing

establishes that Moncier had interrupted the Court no fewer than 14 times during

the November 17 proceedings before the Court's order to Moncier to say not one

more word.  In addition, this case must also be considered in the context of

Moncier's long experience in the defense of criminal cases in the federal courts.

Moncier has practiced law for 38 years and his actions of November 17, 2006,

cannot be viewed as the innocent mistake of a young, inexperienced lawyer or as an

aberrant act.   Although  Moncier's actions on November 17 were decided in a

"split second", his decisions were made in the context of a long career of trying

cases and dealing with judges and courts under circumstances where decisions and

judgments often must be made immediately and without the luxury of extensive

forethought.

Use of the court's criminal contempt power should be made sparingly

and then exercised only with great restraint.  This is especially true where the

alleged contemnor is an attorney because of the need to balance the competing

policy concerns referenced above.  This Court has never made a finding of

contempt in any case, much less that of an attorney.  Dealing with this case is

_____

[5]   This is not to suggest that a contemnor must engage in repeated contemptuous misbehavior
before he may be held in contempt, only that most judges show considerable restraint in dealing with
isolated acts of misbehavior.  The U.S. Supreme Court has expressly rejected a multiple violation
requirement in *Pounders v. Watson*, 521 U. S. 982 (1997).

9

perhaps the most unpleasant duty of the undersigned since assuming the bench; however, this Court has a clear duty to preserve the institutional integrity of the Court and to assure that the Court's duties are carried out through proceedings which are fair and which are conducted with decorum.

Taking the monumental step of accusing an attorney of criminal contempt is an act of last resort and, in this Court's view, should be used only after all other efforts have been exhausted to assure the offending lawyer's compliance with the applicable rules of professionalism and civility. Those efforts had already been exhausted with Moncier. Throughout the course of Moncier's appearances before this Court, this Court has admonished Moncier for a wide range of misconduct, has lectured him concerning the Court's expectations as to professionalism and civility and has threatened him with a finding of contempt on prior occasions, all to no avail. This case, ultimately speaking, presents a very simple issue of whether the presiding judicial official will control the course of the proceedings in the courtroom or whether contumacious lawyers will be permitted to take control.

### Analysis under Section 401(1)

As set forth above, four elements must be established beyond a reasonable doubt before the defendant may be convicted of criminal contempt under

§ 401(1):     (1) misbehavior, (2) amounting to an obstruction of justice, (3)  in the presence of the court, and (4) with the actual intent to obstruct justice.  Each of these elements will be discussed in turn in the context of the evidence in this case.

## Misbehavior

Almost any inappropriate act or comment by a lawyer in legal proceedings could be deemed "misbehavior" and the appellate courts have never precisely defined what constitutes sufficiently egregious misconduct but rather have focused on a "range of contumacious conduct disruptive of judicial proceedings." *Pounders*, 521 U.S. at 991.   Moncier's conduct in this case, however,  – *i.e.*   repeatedly interrupting the court after a warning not to do so and in disobedience to the court's directive commanding his silence – is a clear case of misbehavior as contemplated by the statute and is well within "the range of contumacious conduct disruptive of judicial proceedings and damaging to the court's authority" punishable as criminal contempt. *Id.*

The Court FINDS, beyond a reasonable doubt, that this element of the offense has been established by the proof in this case.

## Obstruction of justice

The United States Supreme Court has stated the question as to this element to be whether the proof establishes that the misbehavior "obstructed

the district judge in the performance of judicial duty." *In re McConnell*, 370 U.S. 230, 234, (1962). "Such obstruction necessarily involves an 'act that will interrupt the orderly process of the administration of justice, or thwart the judicial process.' *United States v. Warlick*, 742 F. 2d 113, 116 (4th Cir. 1984). Thus, the government must show "that the defendant's acts delayed the proceedings, made more work for the judge, induced error or imposed unnecessary costs on the other parties." *Am. Airlines, Inc. v. Allied Pilots Ass'n.*, 968 F. 2d 523, 532 (5th Cir. 1992). At a minimum, the defendant's misconduct must have "had an effect on the proceedings, which presupposes a cause triggered by the attorney's acts." *Id.* (citing *United States v. Oberhellmann*, 946 F. 2d 50, 52 (7th Cir. 1991)) *United States v. Meacham*, 65 Fed. Appx. 529, 535 (6th Cir. 2003) (Daughtrey, J. dissenting).

Although Moncier argues that he lacked the intent to obstruct justice (discussed below), he has not seriously disputed that his actions on November 17, 2006, had a disruptive effect on the proceedings and resulted in a delay of those proceedings. One point raised by Moncier, however, does bear some discussion here. Moncier has asserted through his testimony at trial and in an affidavit filed in support of his pre-trial motion to dismiss that the Court had no right to question his client (i.e. that Rule 44 did not permit the Court's questions), that he had no idea why the Court was asking the questions (except possibly to "clean up the record")

and that his client had communicated to him through eye contact and body language that he wished to talk to him before answering the Court's questions. Such assertions by Moncier lack any credibility.

As the transcript of the November 17, 2006, proceeding reflects, it was Moncier himself who suggested to the Court that there existed "an issue that pertains to Rule 44(c)." [Doc. 688, page 2]. The issue had arisen, according to Moncier, because the United States had provided him, on the day before the sentencing hearing, information relating to a statement made by a co-conspirator attributing to Vassar a potentially incriminating statement about another of Moncier's clients, an unindicted co-conspirator. Moncier then attempted to convince the Court to refer the matter to another district judge for hearing and have independent counsel appointed to advise Vassar about Moncier's possible conflict of interest. Moncier asserted, during the hearing, that his client, Vassar, wasn't going to tell him (Moncier) if he had made the statement because of his representation of the other client. [Doc. 683, page 43]. [6] Moncier wanted Vassar to have the benefit of independent counsel's advice on whether to cooperate with the

---

[6] This episode illustrates the extent to which Moncier's behavior on November 17 was out of control. After making the statement that "[H]e (Vassar) isn't going to tell me (Moncier) if Harold Grooms said that because he knows I represent Harold Grooms," (Doc. 683, p. 43), Moncier was asked by the Court: "Mr. Moncier, do you know what you just said to me?" Moncier's answer was: "No." (Doc. 683, p. 44).

government concerning the contents of the alleged statement in order to seek a motion for downward departure for his assistance.   After the government indicated that it had no interest in debriefing Vassar, the Court denied both requests.

After further attempts to delay the sentencing hearing,  Moncier informed the Court that Vassar had told him during a recess that Vassar did not want him [Moncier] to be disqualified [Doc. 683, p. 78], that he [Moncier] did not "have a conflict", [*Id*, p.  88] and that Vassar wanted to address the Court. [*Id*., pp. 88, 89] [7] Moncier specifically represented that if he could have the lunch hour to work with his client, he would be ready to proceed with the sentencing hearing at 1:30 p.m.   The United States announced that it did not oppose the proceeding going forward with Moncier representing Vassar "if Mr. Vassar represents . . . to the Court that he wishes Moncier to continue as his counsel for this sentencing hearing." [*Id*., pp. 93-94].   Just minutes later, the Court asked Vassar to step to the podium and began to question him with regard to whether he wanted Moncier to continue as his attorney.  It was shortly after that questioning began that the above exchange took place, leading to this proceeding.

Moncier's insistence that Rule 44 did not permit the Court to question

---

[7]  Throughout the November 17  hearing,  Moncier repeatedly requested the Court to perform an inquiry or to permit Vassar to address the Court, which makes Moncier's assertions that he "had no idea" why the Court was inquiring of Vassar even more baffling.

Vassar or that he did not know what the Court was doing is patently absurd and simply not credible in view of the events of November 17. Rule 44 in fact required the Court ("the court must promptly inquire . . .") to question Vassar about the possible conflict of interest called to the attention of the Court by his attorney. The Court would have simply ignored its responsibility to have done otherwise. *See Moss v. United States*, 323 F. 3d 445, 471(6th Cir. 2003) (". . . a trial court has the duty to inquire adequately into a trial counsel's conflict of interest if it knows or reasonably should know that a particular conflict exists.") Also, in light of Moncier's repeated requests to the Court to question Vassar or to allow Vassar to address the Court, as well as the government's assertion just minutes before that the Court should determine if Vassar wanted Moncier to continue as his attorney, Moncier's assertion that he did not have any idea why Vassar had been called to the podium lacks any credibility.

Moncier's claim that he knew Vassar wanted to speak to him is likewise incredible. For one thing, Moncier testified that he made his observation upon Vassar being called to the podium; yet, he made no request to consult with his client during a lengthy exchange between the Court and Vassar (taking up eight pages of the transcript (pages 99-106) and including efforts by Moncier to persuade the Court to rephrase its questions), all of which occurred <u>after</u> Vassar was called to

the podium. Secondly, Moncier's testimony that it was obvious during the proceeding at the podium that Vassar wanted to talk with him conflicts with both the transcript and with the Court's own observations. At no time during these proceedings did Vassar ever request time to consult with Moncier. [8] During the entire proceeding at the podium, Vassar listened intently to the Court's questions and made direct eye contact with the Court. Vassar never exhibited confusion but rather affirmatively acknowledged the Court's inquiry and his understanding of the inquiry.

   The Court FINDS, beyond a reasonable doubt, that this element of the offense has been established by the proof in this case.

---

[8] Such a request would likely have been granted and would not have violated the Court's command <u>to Moncier</u> for silence. Michael Vassar was not unfamiliar with the court system nor with a Rule 44 inquiry. The inquiry of November 17 was the third Rule 44 inquiry conducted with Vassar due to concern about Moncier's simultaneous representation of Vassar and other clients.

   While the right of a criminal defendant to the advice of counsel is well established, Moncier's insistence that he has an unlimited duty and right to speak to is client is misplaced. Moncier's testimony at trial that he was only trying to protect his client's constitutional rights by interrupting the Court's questions and intended to advise his client not to waive any potential conflict of interest by Moncier directly conflicts with Moncier's representation on November 17 that his client wanted to proceed with the sentencing hearing represented by Moncier, that he did not want Moncier disqualified and that Moncier would be ready to proceed with the hearing at 1:30 p.m.

   Moncier's trial testimony also appears to contradict his pre-trial affidavit where he seems to suggest that his true motivation was that he did not want Vassar to answer the Court's question because "clients in criminal cases should never answer questions prior to being advised as to what questions they are going to be asked and them being advised as to the purpose for the question and whether my client should respond." [Doc. 10-3, para. 18]. Moncier cites no authority for such a view of the bounds of proper advocacy. A criminal defense attorney has no absolute right to interrupt proceedings whether conducted by adversary counsel during cross examination or by the court to advise a client how or whether to answer a question.

### In the presence of the Court

The record establishes clearly that Moncier's misbehavior occurred in the presence of the Court. The Court FINDS, therefore, beyond a reasonable doubt, that this element of the offense has been established by the proof in this case. [9]

### Actual intent to obstruct justice

The key question in this case is not whether Moncier's misbehavior obstructed justice (it did) but rather whether he acted with the actual intent to obstruct justice. Moncier testified unequivocally that he did not. As stated by the Sixth Circuit, the improper act must be a "deliberate and intended violation, as distinguished from an accidental, inadvertent or negligent violation." *Vaughn*, 752 F. 2d at 1169 (quoting *TWM Mfg. Co. v. Dura Corp.*, 722 F. 2d 1261, 1272 (6th Cir. 1983)).       The Seventh Circuit has stated the standard for judging the minimum requisite intent for criminal contempt:

> The minimum requisite intent is . . . defined as a volitional act done by one who knows or should reasonably be aware that his conduct is wrongful. . . .  Of course, an actual design to subvert the administration of justice is a more grievous and perhaps more culpable state of mind,

---

[9] This element usually applies in a summary contempt proceeding. See footnote 2 above .

> but proof of such an evil motive is unnecessary to
> establish the required intent.

*United States v. Seale*, 461 F. 2d 345, 368-69 (7th Cir. 1972).

Moncier's misbehavior in this case was clearly intentional but the question is: Was it done with actual intent to obstruct justice?  Determining one's intent is never easy [10] but I find that the record clearly establishes that Moncier acted with the intent to interrupt the orderly process of the administration of justice and to thwart the judicial process.  First of all, Moncier is a very experienced criminal defense lawyer, having practiced for 38 years.  His actions on November 17, 2006, therefore, cannot be viewed as the antics of or displaced aggressiveness of an amateur lawyer but rather as the calculated and deliberate acts of a wily veteran.  He is not a novice at the practice of law and has handled hundreds of civil and criminal cases. [11]  Simply put, Moncier's acts can be labeled neither accidental, inadvertent nor negligent.

Secondly, Monicer's own testimony reveals his motivation and his intent.  Moncier  testified at trial that he "could not, in good conscience, let the Court go forward and take a waiver from a defendant who did not fully understand

---

[10]  "[T]he question of one's intent is not measured by a psychic reading of [the defendant's] mind but by the surrounding facts and circumstances."  *United States v. Bolden*, 325 F. 3d 471, 494 (4th Cir. 2003).

[11]  Moncier has tried five (5) criminal jury trials before this Court in the last three years.

the issue." [12] This testimony clearly illustrates Moncier's intent to prevent the sentencing hearing of Vassar from going forward on November 17. He had filed repeated motions for a continuance in the two weeks leading up to the hearing and appeared to be determined to prevent the hearing from going forward, and he appeared to be seizing upon whatever course of action occurred to him on November 17 to delay the proceedings.[13]

Thirdly, and arguably most importantly, determinations about a party's intent depend largely upon an assessment of his credibility and demeanor by the finder of fact. As set forth more fully above, I do not find much of Moncier's testimony credible nor are his explanations convincing.

Moncier's primary defense in this matter is that he was obligated by his duty to Vassar to seek clarification[14] of the Court's directive by asking to speak to his client in order to prevent harm to his client which would have occurred if Vassar had indicated that he wished to continue to have Moncier to represent him in spite of the potential conflict of interest on Moncier's part. In other words, Moncier

---

[12] This is not a direct quote but rather a paraphrase of Moncier's testimony at trial.

[13] So strong was Moncier's determination not to go forward with the sentencing hearing on November 17 that he, at one point, "threatened" to stand mute during the sentencing hearing of his client.

[14] Although Moncier characterizes his conduct as an effort at clarification, it cannot reasonably be characterized as such.

argues that he was attempting to prevent Vassar from waiving his constitutional right to conflict free counsel.

This is a position adopted and advanced by the Tennessee Association of Criminal Defense Lawyers ("TACDL") as well. [15] TACDL argues that Moncier had both a constitutional and ethical responsibility to interrupt the Court's questioning of Vassar after being instructed not to do so in order to preserve Vassar's constitutional rights, i.e. his Sixth Amendment right to effective and conflict free counsel. TACDL further argues that to construe Moncier's acts as criminal contempt, "then the court will set a precedent that has a chilling effect on advocacy by the criminal defense bar in general, . . ."

As set forth above, an attorney must generally comply with the order

---

[15] TACDL was granted leave to file an *amicus curiae* brief in this case. While the Court welcomes TACDL's view on these issues because of its focus and potentially special insight, the Court was disappointed by the superficial knowledge and treatment of the issue before the Court. First of all, the TACDL brief mistakenly states that Moncier was charged with criminal contempt for requesting permission to speak with his client. That simply is not the case. Secondly, the TACDL motion acknowledges that its brief was based solely on the notice of charges filed by the Court and that TACDL did not view Moncier's conduct in the context of the entire hearing of November 17, 2006.

The TACDL brief was signed by some of the preeminent criminal defense attorneys in Tennessee, several of whom have appeared before this Court. TACDL commendably advocates the fair and effective administration of criminal justice and this Court can only hope that the education and training provided by TACDL to its membership includes the promotion of professionalism and civility in the practice of law– matters which, quite frankly, should be addressed by bar associations and other professional associations of lawyers, not by the courts. This Court would also observe, based upon their conduct when appearing before this Court, that none of the attorneys who signed this brief on behalf of TACDL appear to view zealous advocacy in the same terms as Moncier.

of a court with jurisdiction to make the order, no matter how strong the attorney's disagreement with the order.  That the court's order might be incorrect, tyrannical or "just plain idiotic" is no defense  in a criminal contempt proceeding alleging disobedience of the order.  "Lawyers are required to obey even incorrect orders; the remedy is on appeal." *In re Dellinger*, 502 F. 2d 813, 816 (7th Cir. 1974).  Trial judges are human and will not always be right.  But trial counsel cannot be permitted to flout the rulings of the trial court regardless of how vehemently he disagrees with the ruling.  *Comm. of Pa.  v.  Local Union 542*, 552 F. 2d 498 (3rd Cir. 1997).  The  United States Supreme Court, even while recognizing a narrow exception to the general rule,[16]  has emphasized the "basic proposition that all orders and judgments of courts must be complied with promptly." *Maness*, 419 U.S. at 458. [17]

As for the argument that holding Moncier in contempt would have "a chilling effect on advocacy by the criminal defense bar in general", this Court disagrees.  As stated by the Court of Appeals for the District of Columbia Circuit:

> "Zealous advocacy of a client's cause is never a legitimate
> excuse for disobeying a clear ruling of the court, and

---

[16]    An exception which has no application to this case.

[17]    The narrow exception found by the court in *Maness* dealt with a situation where a defendant was being required to relinquish his Fifth Amendment right against self incrimination, a result for which there was no appropriate remedy on appeal.

> convicting an attorney of contempt for actual
> disobedience will not chill criminal defense attorneys
> from zealous advocacy within the bounds of the law."

*In re Ellenbogen*, 72 F. 3d 153 (D.C. Cir. 1995). Flouting a trial judge's commands

is the very essence of obstruction of justice. *Local Union 542*, 552 F. 2d at 509.

 Prior to assuming the bench, the undersigned regularly represented

criminal defendants in both state and federal courts. This Court understands and

subscribes to an attorney's duty in trying a case to be zealous and fearless in

representing a client's interest. Every defendant is entitled to such advocacy on his

behalf. The direct order of a trial judge, however, fixes the limits of proper

advocacy and the vigor permissible in representing a client's interest never includes

the flouting of a judge's rulings. *See Dunn v. United States*, 388 F. 2d 511, 513

(10th Cir. 1968); *In re Osborne*, 344 F. 2d 611, 615 (9th Cir. 1965). Defiance and

disobedience should not be confused with zealousness or vigorous advocacy.

 Moncier's insistence that his duty to his client required his defiance of

the Court is misplaced. If this Court acted arbitrarily in commanding silence from

Moncier and failed to grant him reasonable opportunity to argue his position to the

detriment of his client, then the court of appeals would have reversed. [18] And even if

---

[18] Moncier does not attempt to show any irreparable harm to Vassar which might have occurred had he complied with the Court's command for silence. It is only that order which requires "an irrevocable and permanent surrender of a constitutional right" which cannot be enforced by the contempt power. *Maness*, 419 U.S. at 460; *In re Grand Jury Proceedings*, 601 F. 2d 162, 169 (5th Cir. 1979).

Moncier subjectively believed that his actions were necessary to preserve issues for appellate review[19] (which he has not claimed), such belief does not excuse direct violation of a direct order of the trial judge. 552 F. 2d at 507; *Hallinan v. United States*, 182 F. 2d 880 (9th Cir. 1950), *cert. denied* 341 U.S. 952 (1951).

In short, someone must be in control of what happens in a courtroom and maintain proper decorum. That person is the trial judge, not the lawyer for a criminal defendant nor the lawyer for the United States. Otherwise, the courts lose their ability to administer justice in an orderly fashion. "[T]he trial judge must have the authority necessary to insure the orderly and expeditious progress of the proceeding. His directives in the exercise of this authority must be obeyed; otherwise the clear result would be courtroom chaos." *United States v. Seale*, 461 F. 2d at 371 (7th Cir. 1971). An attorney who pursues a course that he deems to be in the best interest of his client and deliberately disregards a direct and explicit order of the trial judge offends the dignity and authority of the court and obstructs justice. *Id.* That Moncier might have acted in subjective good faith and without

---

Moncier's counsel tacitly acknowledged that Moncier was not attempting to protect Vassar from the irrevocable surrender of a constitutional right.

[19] Moncier had already stated his objection to the Court's procedure. But even if the Court prevented Moncier from adequately stating his objection, it is well established that an appellate court will not find a waiver of the objection under such circumstances.

disrespect does not negate his intent.  He acted willfully and with full knowledge that the Court would consider his actions contemptuous.  He was explicitly told so.

The Court FINDS, beyond a reasonable doubt, that this element of the offense has been established by the proof in this case.

Having found all of the elements of the offense of criminal contempt pursuant to 18 U.S.C. § 401(1) to have been established beyond a reasonable doubt, I therefore FIND Herbert S. Moncier GUILTY of criminal contempt.

### Analysis under Section 401(3)

Although the record establishes Moncier's guilt pursuant to  18 *U.S.C.* § 401(1), the Court will alternatively consider defendant's conduct under § 401(3). As set forth above,  § 401(3) requires proof beyond a reasonable doubt of (1) resistance or disobedience to the court's lawful[20]  order or command and (2) the act of resistance or disobedience was intentional or willful.

### Disobedience to the Court's order or command

On November 17, 2006,  Moncier received a direct, unequivocal command for silence and that he not further interrupt the Court's inquiry.  The issue in this case is not whether the order was a proper or correct order.  Other judges

---

[20]    The order is lawful if made by a court having subject matter jurisdiction over the case and personal jurisdiction over the parties. *Maness*, 419 U.S. at 459.  As set forth below, Moncier does not contest either subject matter or personal jurisdiction.

might well disagree with or find improper the order issued by the Court. Regardless, however, Moncier had the duty to obey the Court's order. *See Maness* 419 U.S. at 459 (stating that an order by a court with jurisdiction, particularly during trial, "must be complied with promptly and completely" until reversed). He has not seriously contested the lawfulness of the order [21] or his disobedience of it. This element of the offense is established, beyond a reasonable doubt, from the proof in this case.

**Intent**

The crucial question, here, as with Moncier's intent to obstruct justice, is whether he acted willfully and intentionally in violating the Court's order. For many of the same reasons which led the Court to conclude that he acted with the intent to obstruct justice, this Court FINDS beyond a reasonable doubt that Moncier's violation of the Court's order was willful and intentional.

The Court likewise FINDS, therefore, that Moncier is also GUILTY of criminal contempt in violation of 18 U.S.C. § 401(3).

---

[21] Although some suggestion was made by Moncier's counsel during the trial that this Court's order was unlawful, counsel acknowledged, in response to the Court's question, that this Court clearly had both subject matter and personal jurisdiction and there is, therefore, no question as to the lawfulness of the Court's order.

## CONCLUSION

This Court heard proof in this case on April 24, 2007 and was prepared to rule at the conclusion of that proof; however, since the case involves such an important issue, the matter was taken under advisement for further careful and extended consideration. After considering this matter carefully and thoughtfully over the ensuing weeks, this Court has come to the regrettable and unfortunate conclusion that the proof establishes that Moncier is guilty beyond a reasonable doubt of criminal contempt under both subsections one and three of 18 *U.S.C.* § 401. The record in this case clearly establishes beyond a reasonable doubt that Moncier disobeyed the clear, unequivocal and lawful order of this Court and that he did so with the intent to obstruct the administration of justice and to interfere with the orderly conduct of this Court's proceedings on November 17, 2006.

While it would have been far easier and less time consuming for this Court to ignore Moncier's contemptuous conduct, to do so would be to encourage disobedience to lawful court orders. The ability of this Court– indeed, all courts – to compel obedience to its orders is fundamental to its proper function. For the Court to turn its head to Moncier's conduct would likewise further erode the respect

of the public for the bar, the vast majority of whom take seriously "the processes of an orderly trial, which are the supreme object of the lawyer's calling." *Sacher v.United States*, 343 U.S. 1 (1952). The vast majority of lawyers vigorously represent their clients and understand that zealous representation of a criminal defendant does not include deliberate defiance of a judge's direct and explicit orders. Moncier's deliberate and continued interruption and argument with the rulings of the court and his unprofessional and contumacious conduct must cease; otherwise, the Court surrenders control and independence of the proceedings to lawyers who "equate contempt with courage ." *Id.* This Court is unwilling to do so.

Sentencing in this matter is set for August 27, 2007, at 9:00 a.m. This matter is referred to the United States Probation Office for the preparation of a presentence report, as requested by the defendant. Sentencing proceedings in this matter will be conducted in accordance with LR 83.9.

This offense is punishable by an appropriate fine or by a term of imprisonment. The sentencing guidelines do not suggest a guideline range for this type of criminal contempt, *see U. S. Sentencing Guidelines Manual* Section 2J1.1 (2006); however, as indicated by this Court's prior rulings in this matter, the Court will consider a term of imprisonment not to exceed six (6) months and will consider all of the factors set forth in 18 U.S.C. § 3553(a) in determining an appropriate

sentence in this case. Not later than August 13, 2007, each of the parties shall file with this Court a sentencing memorandum which addresses the relevant factors set forth in 18 U.S.C. § 3553(a) as well as any argument the party wishes to make as to an appropriate sentence. A copy of this sentencing memorandum shall also be supplied to the Probation Officer.

SO ORDERED.

ENTER:


s/J. RONNIE GREER
UNITED STATES DISTRICT JUDGE