# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
### GREENEVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Case No. 2:07-cr-00040 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| HERBERT S. MONCIER, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION
### FINDINGS OF FACT AND CONCLUSIONS OF LAW

An April 18, 2007 formal notice under Federal Rule of Criminal Procedure 42(a) charged Defendant Herbert S. Moncier with criminal contempt of court in violation of 18 U.S.C. § 401(1) & (3). (See Complaint/Order Notice of Charges, ECF No. 1.) The charges arose from a November 17, 2006 sentencing hearing before United States District Judge J. Ronnie Greer. The case proceeded to a bench trial on April 24, 2007, after which Judge Greer found Moncier guilty of criminal contempt. (Mem. Opinion and Order, ECF No. 44, at 26.)

Moncier appealed his conviction to the United States Court of Appeals for the Sixth Circuit. (See Notice of Appeal, ECF No. 68.) After the submission of written briefs and oral argument, the Sixth Circuit issued a published opinion reversing Moncier's conviction. See United States v. Moncier, 571 F.3d

593, 594 (6th Cir. 2009). The Sixth Circuit held that Federal Rule of Criminal Procedure 42(a)(3) required Judge Greer to disqualify himself from presiding over Moncier's trial because Moncier's actions involved disrespect toward Judge Greer. Id. at 599-600. The opinion also ordered that Moncier be retried before a different district judge. Id. at 600. Moncier sought Supreme Court review of the Sixth Circuit's holding that his actions could constitute criminal contempt of court. On March 29, 2010, the Supreme Court denied his petition for a writ of certiorari. Moncier v. United States, 130 S. Ct. 2078 (2010) (order denying certiorari). Following the Supreme Court's denial of certiorari, the undersigned was appointed on April 19, 2010, to preside over Moncier's retrial. (See Order of Reassignment, ECF No. 102.)

The Court conducted a bench trial on the criminal contempt charge in Knoxville, Tennessee, on June 21-22, 2010. Assistant United States Attorney Robert M. Reeves represented the government and attorney David Wigler represented Moncier. Both sides presented evidence through witnesses and introduced exhibits. The Court makes the following findings of fact and conclusions of law based on the evidence presented at the bench trial.

## I.    FINDINGS OF FACT

Moncier is a well-known criminal defense lawyer with offices in Knoxville, Tennessee. (Trial Tr., ECF No. 168, at 55.) He received both his bachelor's and law degrees from the University of Tennessee. (Def.'s Ex. 4, at 1.) Moncier was admitted to the Tennessee Bar in 1970. (Id.) After graduating from law school, he was drafted into the army where he joined the Judge Advocate General's Corps and served as a prosecutor and a criminal defense attorney from 1971-74. (Id.) He returned to Knoxville in 1974, after his discharge from the Army, and took a job as a state prosecutor in the Knox County District Attorney's Office. (Id.) Moncier entered private practice in 1976, focusing on criminal defense work, and has maintained his own practice to the present. (Id.; Trial Tr. at 57-58.)

On October 4, 2005, Michael Vassar retained Moncier as his attorney. (Def.'s Ex. 8, at 3.) Vassar was charged with narcotics and firearms offenses in the United States District Court for the Eastern District of Tennessee. (Id. at 1.) Vassar's brother, R.J. Vassar, Jr., and Vassar's wife, Vicki Vassar, agreed to be responsible for Moncier's fees. (Id. at 3.) Moncier required R.J. and Vicki to pay a nonrefundable $50,000 retainer. (Trial Tr. at 135; Def.'s Ex. 8 at 1.) Moncier would earn an additional $2,000 for each full day he

3

appeared in court on Vassar's behalf and $1,000 for each half-day or less. (Trial Tr. at 135-36; Def.'s Ex. 8, at 2.) Moncier also notified Vassar that he represented other defendants charged or otherwise implicated in the same drug conspiracy as Vassar. (Def.'s Ex. 8 at 4-7.) Among those clients was Harold Grooms. Grooms, an unindicted person implicated in the same drug investigation, had retained Moncier in anticipation of a possible indictment. (Id. at 5; Trial Tr. at 137.) The potential conflict between Moncier's concurrent representation of Vassar and the unindicted Grooms gave rise to the events of November 17, 2006. (Trial Tr. at 64-65.)

Moncier had represented Vassar through three jury trials. (Id. at 58.) Juries acquitted Vassar of all charges except conspiracy to distribute less than 500 grams of cocaine. (Id. at 58, 181.) A jury convicted Vassar on this, a lesser count, as he had originally had been charged with conspiracy to distribute more than five kilograms of cocaine. (Id. at 181.) Judge Greer scheduled the sentencing hearing for this conviction on November 17, 2006. (Id. at 58.) The primary issue at the hearing was whether Vassar should be responsible for distributing more than the five hundred grams of cocaine for which the jury had convicted him. (Id. at 181-82.)

On November 16, 2006, the day before the sentencing hearing, Moncier received a fax from Assistant United States

4

Attorney M. Neil Smith (the "Smith Letter"). (Id. at 65; see also Def.'s Ex. 5.) The letter informed Moncier of information in the files of the Federal Bureau of Investigation and the Tennessee Bureau of Investigation that might be of use to Moncier during the next day's sentencing hearing. (Def.'s Ex. 5 at 1.) Although much of the information disclosed could be helpful to Vassar at sentencing, Moncier became concerned about a disclosure toward the end of the letter. (Trial Tr. at 65, 68.) The letter stated that Mark Thornton, who was implicated in the same drug conspiracy as Moncier's clients Vassar and Grooms, had told authorities that he had had conversations with Vassar in jail. (Def.'s Ex. 5 at 2.) Thornton related that Vassar had confided to him that Grooms had offered to help Vassar in any way that Grooms could, including providing Vassar with drugs. (Id.) Vassar allegedly said that authorities had arrested him before he could complete any drug transactions with Grooms. (Id.)

This revelation created three problems. First, if what the letter said were true, Vassar might be subject to prosecution for perjury or obstruction of justice because he had earlier denied before Judge Greer that he knew anything about alleged drug activity involving Grooms. (Trial Tr. at 64, 69-70.) Second, if Vassar had information about Grooms' involvement in the drug conspiracy, Vassar might be able to receive a reduced

sentence if he cooperated with the government's investigation. (November 17, 2006 Tr., Gov't Ex. 1, at 20.) ("Hearing Tr.") Moncier could not assist Vassar in any possible negotiations with the government, however, because that would conflict with his duty of loyalty to his other client, Grooms. (Id.) Third, the Smith Letter raised the issue of whether Moncier should call Thornton at Vassar's sentencing hearing. (Id. at 27-28.) Moncier had subpoenaed Thornton to testify on Vassar's behalf at the hearing; but, if Thornton earlier had asserted that Vassar had information about Grooms, the government could uncover that information on cross examination and possibly expose Vassar to a sentencing enhancement for perjury or obstruction of justice. (Trial Tr. at 70.)

Moncier could not speak to Vassar in person about the Smith Letter because Vassar was housed at the Jonesborough detention facility, 2.5 hours north of Knoxville. (Id. at 69.) Moncier also believed that prison authorities taped his telephone calls with Vassar. (Id.) He worried that, on learning of the information contained in the Smith Letter, Vassar might blurt out a response that the government could later use against Vassar at the hearing. (Id. at 70.) Moncier, thus, waited to speak with Vassar about the letter until 8:05 AM the day of the sentencing hearing. (Hearing Tr. at 11, 22.) He told Vassar of the Smith Letter's contents, but asked Vassar not to respond

6

about the truth of those revelations until Moncier could obtain permission from Judge Greer for another, disinterested party to question Vassar about the letter. (Id. at 11.)

When the hearing began at 9:05 AM on November 17 at the federal courthouse in Greenville, Moncier asked that Judge Greer allow him to address the Smith Letter in chambers. (Hearing Tr. at 2.) Judge Greer instead chose to clear the courtroom of everyone but the parties to the case and court personnel. (Id. at 3.) Moncier then began his "continuum of efforts" to obtain independent advice for Vassar about the potential conflict. (Trial Tr. at 65.) First, Moncier sought to have the Court designate a separate district judge to hear the issues about the potential conflict. (Id.) Moncier worried that information Judge Greer would learn might influence his later sentencing decision. (Id.; Hearing Tr. at 5.) Moncier told Judge Greer that "[i]nstinct and human nature" would make it difficult for the judge to separate factual issues tied to the potential conflict from those at issue in the sentencing hearing. (Hearing Tr. at 6.) Judge Greer suggested a compromise whereby a magistrate judge would question Vassar about the contents of the Smith Letter in camera and under seal, with any answer Vassar gave protected by immunity. (Id. at 17.) Moncier rejected this alternative. (Id.)

7

Next, Moncier asked Judge Greer to appoint an independent counsel to question Vassar about the veracity of the statements Thornton made and report back to the Court if, based on Vassar's answer, there was an actual conflict. (Trial Tr. at 65-66; Hearing Tr. at 13.) Judge Greer questioned Moncier about this request, noting that the potential conflict that had appeared "could be foreseen by everybody." (Hearing Tr. at 23.) He then went on to note that this situation illustrated why "it's not a good practice for a lawyer to represent codefendants." (Id. at 26.) Judge Greer advised Moncier that lawyers who represent codefendants jeopardize their law licenses because of the resulting ethical questions. (Id.) The government notified the Court that it had no interest in speaking to Vassar about Grooms because of Vassar's suspect credibility. (Id. at 27.) Judge Greer denied Moncier's request for the appointment of independent counsel after a brief recess. (Id. at 33.)

Once the Court had denied his request, Moncier asked to approach the bench to speak with Judge Greer privately. (Id. at 36.) Moncier wanted to highlight what he saw as the gravity of the potential conflict and to reiterate why, absent the appointment of independent counsel, he would have to withdraw from representing Vassar. (Id. at 33-36.) During this bench colloquy with Judge Greer, Moncier made several statements that concerned the Court. He accused the government of staging a

8

"set up" (id. at 37) by seeking to remove him from the case in retaliation for the success he had had representing criminal defendants at trial. (Id. at 39-40.) Moncier then stated that he would not "walk into this trap" and would "sit there and remain moot [sic]" during the sentencing hearing. (Id. at 41.) When asked for clarification, Moncier stated that he could not provide Vassar with a defense under the present circumstances. (Id. at 42.) Moncier closed by stating that Vassar would not tell him "if Harold Grooms [made incriminating statements] because [Vassar] knows I represent Harold Grooms." (Id. at 43.)

Judge Greer took these statements seriously because they suggested that there might be an actual conflict based on Moncier's simultaneous representation of Vassar and Grooms. (Id. at 44, 54.) He ended the bench conference and ordered that all further proceedings at the hearing be in the presence of Vassar. (Id. at 55-56.) Moncier suggested that, because of the Court's refusal to designate another district judge or an independent attorney to advise Vassar about the conflict, the Court should talk to Vassar directly about the issue. (Id. at 57.) The Court stated that it was inclined to find that an actual conflict of interest existed that Vassar could not waive. (Id. at 68-69.) Judge Greer agreed to recess Court briefly to allow all parties to consider this initial impression. (Id. at 69.) Moncier once again suggested that the court question

9

Vassar directly. (Id. at 70.) Judge Greer said that, during the recess, he would review the court reporter's transcript to confirm that Moncier indeed had said that Vassar would not talk to him because of Moncier's simultaneous representation of Grooms. (Id. at 76.)

Once the hearing resumed, Moncier spoke at length about why he felt that the earlier statement he had made did not indicate an actual conflict. (Id. at 76-89.) Moncier suggested that Judge Greer did not approve of the way Moncier had defended his clients or the successful results his "style" of representation had earned. (Id. at 87-88.) Judge Greer responded to these accusations. (Id. at 90-93.) He noted that "There have been a number of occasions when I have complimented you in the open courtroom on the success you've had in defending criminal defendants." (Id. at 90.) Judge Greer also stated that he had "never been disappointed or upset when [Moncier] got[] an acquittal in this court" and that he had never "expressed an overall dislike to the way [Moncier] present[ed his] cases." (Id.) Instead, what Judge Greer objected to was Moncier's "lack of civility" and "lack of candor." (Id.) Moncier regularly made "personal aspersions" about his adversaries and Court personnel and refused to abide by decisions the Court had made — for example, referring to evidence in front of a jury that the Court had excluded from trial. (Id.) Judge Greer noted that

10

Moncier had exhibited these behaviors during the Vassar trial and had continued to accuse the government and the Court at the sentencing hearing. (Id. at 90-91; see also id. at 91 (noting that Moncier accused the government of "concoct[ing]" the conflict to get Moncier removed from the case).) However, Judge Greer stated that none of these issues had anything to do with what was before the Court – whether Moncier had an actual conflict in his concurrent representation of Vassar and Grooms. (Id. at 92.)

During the verbal exchange between the Court and Moncier, Moncier suggested three more times that the court directly ask Vassar about the conflict. (Id. at 88-89.) The Court agreed with this recommendation, again declined to appoint independent counsel, and proceeded to speak to Vassar directly. (Id. at 98-99; see also id. at 98 (chastising Moncier for "another example of why [Moncier] and [the Court] get crossways because [Moncier] simply will not follow [the Court's] directions" to save further argument for the sentencing hearing).) The Court explained to Vassar why Moncier's simultaneous representation of him and Grooms could be problematic. (Id. at 99-101.) On learning of the seriousness of the conflict, Vassar wavered about whether he wanted Moncier to continue to represent him. (Id. at 102.)

At this point, Moncier began to object to the Court's questioning of Vassar. (Id. at 103.) The Court explained to

11

Vassar the specific decision that Moncier would have to make later that day about whether to call Thornton as a witness at Vassar's sentencing hearing and how the fact that Thornton's testimony could implicate Moncier's other client, Grooms, could affect Moncier's decision. (Id. at 104.) Moncier again objected and asked the Court to get even more specific about the problems of Thornton's testimony. (Id. at 105.) The Court continued its dialogue with Vassar:

> THE COURT: NOW, YOU UNDERSTAND HOW THOSE CONFLICTS CAN ARISE IN THE CONTEXT OF THIS CASE WITH MR. MONCIER REPRESENTING HAROLD GROOMS AND REPRESENTING YOU AT THE SAME TIME?
>
> MR. VASSAR: I UNDERSTAND.
>
> THE COURT: OKAY. IT'S A VERY SIMPLE QUESTION THEN, UNDERSTANDING HOW THOSE CONFLICTS CAN ARISE, DO YOU WANT MR. MONCIER TO CONTINUE REPRESENTING YOU IN THIS CASE OR DO YOU WANT ME TO SEE IF I CAN FIND SOMEBODY WHO HAS NO CONNECTION WITH ANY OTHER CODEFENDANT OR POTENTIAL CODEFENDANT IN THIS CASE?
>
> MR. MONCIER: ONCE AGAIN, YOUR HONOR – –
>
> THE COURT: MR. MONCIER – –
>
> MR. MONCIER: HE MAKES – –
>
> THE COURT: MR. MONCIER, YOU BE QUIET.
>
> MR. MONCIER: MAY I APPROACH THE BENCH?
>
> THE COURT: YOU MAY STAND THERE AND DO WHAT I TOLD YOU UNTIL MR. VASSAR ANSWERS THIS QUESTION.
>
> MR. MONCIER: FOR THE RECORD, YOUR HONOR, I OBJECT WITHOUT HIM HAVING – –

THE COURT:  MR. MONCIER, ONE MORE WORD AND YOU'RE GOING TO JAIL.

MR. MONCIER:  MAY I SPEAK TO MY – –

THE COURT:  OFFICERS, TAKE HIM INTO CUSTODY. WE'LL BE IN RECESS.

(Id. at 106-07.)  The Court held Moncier in contempt but delayed adjudication for a later formal hearing.  (Id. at 114.)

Court reporter Karen Bradley was present at the November 17, 2006 sentencing hearing to transcribe the proceedings. (Trial Tr. at 18.)  Bradley has worked as a court reporter for thirty years, twenty-two of them in the Federal District Court in Greenville.  (Id. at 17.)  Bradley testified that, in her transcript, two dashes symbolize an interruption:  where the next speaker cuts off the prior speaker before the prior speaker has finished his thought.  (Id. at 21.)  Bradley recalled that, by the end of the lengthy hearing, both Judge Greer and Moncier "were a little testy with each other."  (Id. at 23.)  Judge Greer, however, only became testy toward the end of the hearing, having been very patient with Moncier until the hearing's latter stages.  (Id. at 24.)  No vulgarities or shouting occurred. (Id. at 32.)  Bradley testified that Moncier only "sometimes" stopped speaking when Judge Greer interposed a question or comment.  (Id. at 34.)

Kathy Hopson, the courtroom deputy clerk on duty for the November 17 hearing, also testified. (Id. at 38.) Hopson has worked for the Greenville division of the district court since January 1995. (Id.) Hopson remembers that Moncier was "a little argumentative" with Judge Greer. (Id. at 40.) She also recalled several times when Moncier interrupted Judge Greer. (Id. at 40-41.) Specifically, Hopson thought that it was very clear that Moncier did not want Vassar to answer the Court's question about whether Vassar wanted Moncier to continue to serve as his attorney. (Id. at 41.) Hopson recalled that Vassar's body language changed during this exchange and that Vassar stepped away from Moncier, as if to distance himself from Moncier. (Id. at 41-42.) She stated that the events of that day were "just something [she] will never forget." (Id. at 42.) Like Bradley, Hopson did not feel that Moncier was yelling; but Hopson did note that Moncier would "make himself heard." (Id. at 46, 48.) She felt that Moncier disrespected Judge Greer when he continually interrupted the Judge just before being held in contempt. (Id. at 46; see also Hearing Tr. at 107.) Hopson testified that Judge Greer was "more than patient" with Moncier throughout the hearing. (Trial Tr. at 48.)

The Court finds the testimony of Bradley and Hopson credible and supported by the record. The transcript reveals that, as the hearing continued, both Judge Greer and Moncier

14

grew testy. (See, e.g., Hearing Tr. at 86-93; 103-107.) Judge Greer noted on the record that he felt he had been "very patient" with Moncier. (Id. at 87.) The record reflects that the hearing consisted of a series of long statements by Moncier, interspersed with questions from the Court or statements by the government. (See, e.g., 7-12, 17-21, 23-26, 35-40, 63-69, 76-93.) Judge Greer allowed Moncier to make several accusations of bad faith toward the government and the Court without any threat of sanction. (Id. at 37-40, 86-89.) The exchanges between Moncier and Judge Greer were contentious at times. Judge Greer told Moncier that Moncier needed "to have [his] head examined" for trying to represent more than one possible co-defendant in a drug conspiracy case. (Id. at 54.) He also noted that, although he had no problem with Moncier's aggressive representation of his clients or his success in various jury trials, he objected to Moncier's pattern of personally attacking his opponents. (Id. at 90-92.) Moncier was given to conspiratorial theories centered on his greatness as a trial attorney and the need for others to stop him from representing clients. (Id. at 37-40, 86-89.) He interrupted the Court repeatedly. (Id. at 50, 53, 65, 70-71, 95, 98, 107.)

The hearing transcript is an accurate reflection of what occurred on November 17, 2006. Bradley is a court reporter with thirty years' experience. (Trial Tr. at 17.) She was a

15

credible witness. A skilled court reporter like Bradley can accurately transcribe quick exchanges among participants, including noting interruptions in mid-sentence. The Court finds that Moncier has a clear, distinctive, and dominant voice that can easily be heard above others. Because Bradley checked the transcript against a tape recording she made of the hearing, the Court has no doubt that Bradley accurately transcribed the colloquies at the hearing.[1] (Id. at 31.)

Moncier chose to testify in his own defense. (Id. at 55.) He stated that it was clear to him that his client Vassar "was confused" about what was occurring during the sentencing hearing. (Id. at 60.) Moncier endeavored to eliminate that confusion by asking Judge Greer to have Vassar receive independent advice from another district judge; a specially-retained attorney; or, as a last resort, from Judge Greer. (Id. at 65-67.) In Moncier's mind, everything he did was to assure the correct administration of justice and ensure that his client received effective representation. (Id. at 72.) Moncier emphasized during his testimony that he was prepared to go forward with the sentencing hearing that day and had no intent to obstruct the hearing with his objections. (Id. at 74. But see Hearing Tr. at 48 (noting that Moncier had sought to have

---

[1] Bradley regularly reused her tapes so that she taped over the recording of the November 17, 2006 hearing. The tape recording, therefore, is unavailable. See United States v. Moncier, No. 2:07-cr-00040, 2010 U.S. Dist. LEXIS 47475, at *2-3 (E.D. Tenn. May 13, 2010).

the hearing delayed four times in two weeks and questioning whether the present objections were his latest attempt to delay the sentencing).)

In his testimony, Moncier admitted that, in hindsight, he had made a mistake in acting as he did at the sentencing hearing. (Trial Tr. at 72, 99.) When he spoke at line 15 on page 107 of the Hearing Transcript, he was asking Judge Greer if he could speak to Vassar before Vassar answered Judge Greer's question. (Id. at 72, 81.) Moncier asserts that, had Judge Greer denied his request to speak to Vassar, he "would have stood there," having perfected the matter for appeal. (Id. at 83.) At no time, Moncier testified, did he yell, shout, raise his voice, or otherwise disrespect Judge Greer. (Id. at 82.)

Although Moncier now admits that he was wrong, he asserts that, because of the poor acoustics in the Greenville courtroom where the sentencing hearing occurred, he often had trouble hearing what Judge Greer said. (Id. at 87.) Moncier also testified that he suffers from severe sleep apnea. (Id. at 83.) His physician, Dr. Michael Eisenstadt, who specializes in sleep disorders, diagnosed this condition in the mid 1990s. (Id.; see also Def.'s Ex. 7, Eisenstadt Aff. ¶ 4.) ("Eisenstadt Aff.") Eisenstadt prescribed use of a Sullivan Continuous Positive Air Pressure Machine ("CPAP") to treat Moncier's sleep apnea. (Eisenstadt Aff. ¶ 8.) Moncier refers to the device, which he

17

is to wear while sleeping to keep his airway passages open, as his "snout." (Trial Tr. at 83.) Eisenstadt's affidavit states that he is "advised" that the left nostril of the CPAP machine became impacted, and the machine's filter was clogged. (Eisenstadt Aff. ¶¶ 13-14.) This could cause the machine not to function properly and prevent Moncier from receiving proper sleep. (Id. ¶ 15.) Eisenstadt prescribed a new CPAP machine for Moncier to solve this problem because poor sleep causes fatigue, impairs judgment and cognition, and can cause aggression, obsession, or procrastination. (Id. ¶¶ 17-20.)

Attorney John T. Milburn Rogers, who came to the Greenville courthouse to serve as Moncier's counsel shortly after Moncier was held in contempt, testified that Moncier's condition was "horrible" following the sentencing hearing. (Trial Tr. at 146.) Rogers stated that Moncier "wasn't himself" and could not explain clearly and concisely what had occurred or why he was held in contempt. (Id. at 147.) Moncier's condition caused Rogers to ask Moncier if his CPAP were working properly. (Id.) Rogers did not state what Moncier's response to this question was. (Id.) However, Rogers did testify that, before Moncier's first trial on the contempt charge, he had Moncier's CPAP machine tested and found it faulty. (Id. at 149.) Moncier prevented Rogers from introducing that evidence during his first trial. (Id.)

18

The Court finds Moncier's statements that he now realizes his actions were wrong to be sincere, but non-probative of the issue before the Court: his state of mind at the November 17, 2006 sentencing hearing. The Court also rejects Moncier's assertions that he might not have been able to hear Judge Greer or that his sleep apnea played a role in his contempt citation.

At one point early in the hearing, Moncier did state that he did not hear what Judge Greer had just said. (Hearing Tr. at 23.) That is the only time during the hearing that Moncier said he was having trouble hearing the Judge or any other participant. (See id.) Notably, Moncier did not ask Judge Greer to repeat himself during the colloquy with Vassar. (See id. at 99-107.) Moncier did not assert at the hearing that he could not hear Judge Greer's admonition to stop interjecting and allow Vassar to answer the Judge's question about whether Vassar wanted Moncier to continue as his attorney. (Id. at 103-107.) At the relevant time, there is no question that Moncier heard everything Judge Greer said. Moncier's repeated objections to Judge Greer's every attempt to question Vassar demonstrate this conclusively. (Id. at 106-07.)

Eisenstadt's affidavit confirms that Moncier suffers from sleep apnea and has had trouble with his CPAP machine in the past. (Eisenstadt Aff. ¶¶ 12-16.) The affidavit does not assert that Moncier's CPAP machine malfunctioned the night

before Vassar's sentencing hearing. (See id.) Rogers testified that, in preparation for Moncier's first contempt trial, he tested the CPAP machine and found that it was malfunctioning. (Trial Tr. at 149.) Neither Rogers nor Moncier testified that Moncier's CPAP malfunctioned the night before the hearing. (See id. at 83-87, 142-50.)

The Court finds that, regardless of whether the machine malfunctioned during the time surrounding the hearing, Moncier's sleep apnea did not hamper his performance on November 17, 2006. Moncier was alert during the hearing and able to make his points forcefully and repeatedly. (See, e.g., Hearing Tr. at 4-12.) He came into the hearing with a well thought out "continuum" of options for the Court to address the concerns he had about the revelations in the Smith Letter. (Trial Tr. at 65-67.) During the entire course of the hearing, Moncier never lost his train of thought or appeared befuddled by what occurred in the courtroom. Moncier dominated the proceedings. His arguments constitute by far the majority of the hearing transcript. All witnesses agree that Moncier, although perhaps "a little argumentative," (id. at 40) did not lose his temper, use vulgarity, or shout. (Id. at 32, 46, 82.) Moncier's sleep apnea did not affect his performance during the sentencing hearing.

20

As to Moncier's goal in repeatedly objecting to questions about whether Vassar wanted Moncier to continue as his counsel, the Court finds that Moncier wanted to prevent Vassar from answering Judge Greer's question absent further advice from Moncier. Three observations require this finding. First, although Moncier and the Court had a spirited discussion throughout the hearing, it was only after Vassar preliminarily indicated some concern about Moncier's continuing to serve as his attorney that Moncier began repeatedly objecting and interrupting the court. (See Hearing Tr. at 102-07.) When Judge Greer asked the "very simple question" about whether, now that Vassar knew the extent of the potential conflict, Vassar wanted Moncier to continue to serve as his attorney, Moncier's objections prevented Vassar from answering. (See id. at 106-07.)

Second, Moncier's own testimony reveals that his primary concern was that Vassar might waive his right to "counsel of his own choice." (Trial Tr. at 60.) Moncier had not had an opportunity to speak with Vassar about that right and about what answering the Court's question "yes" would mean for their attorney-client relationship. (Id. at 58-59.) Moncier's repeated objections had the effect of preventing Vassar from answering the Court's question before Vassar received advice from Moncier. That Moncier's continuing objections allowed him

to further his stated aim of preventing an unadvised answer supports a finding that Moncier objected for the purpose of preventing Vassar from responding to the Court's question without advice from Moncier.

Third, Vassar's testimony reveals that, if given the opportunity to answer the Court's question, he would probably have decided to have new counsel appointed. Under cross-examination, Vassar admitted that, at the time, he felt that Moncier was more interested in representing Grooms than him. (Trial Tr. 201-03.) Recorded jailhouse telephone conversations between Vassar and his brother confirm that Vassar had doubts about Moncier's loyalty to him. (Id.) This evidence is consistent with Hopson's testimony that Vassar appeared to step away from Moncier during the final portion of the hearing as if to separate himself from Moncier. (Id. at 41.) It also supports the Court's understanding of Vassar's statement to Judge Greer, "I'll have to go that way then because I feel like – I want to feel like I'm going to be fairly represented," as indicating that Vassar was leaning toward seeking new counsel. (Hearing Tr. at 102.) That Vassar was vacillating about Moncier's continued status as his attorney would give Moncier reason to delay Vassar's decision about whether he wanted to waive the conflict. The Court can reach no other conclusion

than that Moncier's objections served to impede Vassar from answering Judge Greer's query.[2]

## II. CONCLUSIONS OF LAW

The Notice of Charges specifies, and the parties agree, that Moncier is charged with criminal contempt of court under two separate theories. (See ECF No. 1); see also 18 U.S.C. § 401(1) & (3). Moncier argues that this Court should analyze the two theories separately, keeping in mind the differing standards. (Def.'s Proposed Findings of Fact and Conclusions of Law, ECF No. 171, at 1.) ("Def.'s Findings") He is correct.

Courts have the inherent power to punish for contempt. Vaughn v. City of Flint, 752 F.2d 1160, 1166 (6th Cir. 1985). Congress recognized that inherent power by specifically granting the federal courts wide contempt powers in the Judiciary Act of 1789. Id. In 1831, however, Congress limited the contempt power of the judiciary in order to curb perceived abuses of that power and to protect the procedural safeguards the Bill of Rights provides to criminal defendants. In re McConnell, 370 U.S. 230, 233-34 (1962). The current contempt statue, codified at 18 U.S.C. § 401, is the descendent of the 1831 provision. Id. at 233. Although providing the courts with "ample power to protect the administration of justice," Congress limited

---

[2] In making this finding, the Court does not adopt the government's theory that the large amount of money Moncier stood to make from representing multiple clients motivated his conduct. (See Trial Tr. at 120.)

23

contempt to "the least possible power adequate to the end proposed." In re Michael, 326 U.S. 224, 227 (1945) (citation omitted).

## A. Obstruction of the Administration of Justice

The first subsection of the current contempt statute confers on federal courts the power to punish the "[m]isbehavior of any person in its presence or so near thereto as to obstruct the administration of justice." 18 U.S.C. § 401(1). The government must demonstrate the presence of four elements beyond a reasonable doubt before a defendant may be found guilty of contempt under the first subsection: 1) misbehavior; 2) the misbehavior amounts to an obstruction of justice; 3) the misbehavior occurred in the court's presence; and 4) "some form of intent to obstruct." Vaughn, 752 F.2d at 1167. To demonstrate that the misbehavior obstructed the administration of justice, the government must prove that the act "interrupt[ed] the orderly process of the administration of justice, or thwart[ed] the judicial process." Id. (quoting United States v. Warlick, 742 F.2d 113, 116 (4th Cir. 1984)). It is not necessary that the obstructive act involve "an element of violence, physical force, or vituperation." Id. at 1168 (citation and internal quotation marks omitted). However, the obstruction must be actual and not theoretical. Id. The minimum showing necessary to prove intent is "proof of 'a

24

volitional act done by one who knows or should reasonably be aware that his conduct is wrongful.'" <u>Id.</u> at 1167 (quoting <u>United States v. Seale</u>, 461 F.2d 345, 368 (7th Cir. 1972)). Accidental, inadvertent, or negligent acts are not sufficient. <u>Id.</u> at 1168.

### 1. Good faith is subsumed in the intent analysis

Moncier argues that there is an additional element of contempt under subsection one – bad faith. (Def.'s Findings at 2-7.) To support his argument, Moncier cites language from two Supreme Court cases. (<u>Id.</u> at 2.) In <u>In re Watts</u>, 190 U.S. 1, 29 (1901) the Supreme Court held that "If an attorney acts in good faith and in the honest belief that his advice is well founded and in the just interests of his client, he cannot be held liable for error in judgment." The Court cautioned that the contempt power should not foil attorneys' "fearless discharge of their duty" to represent their clients zealously. <u>Id.</u> at 35. Moncier also cites the Supreme Court's similar admonition in <u>In re McConnell</u> that "it is . . . essential to a fair administration of justice that lawyers be able to make honest good-faith efforts to present their clients' cases." 370 U.S. at 236.

Rather than constituting a separate element of the offense, the requirement of good faith is subsumed in the requirement that a defendant charged under subsection one have an "intent"

to obstruct justice.  See Vaughn, 752 F.2d at 1167.  Vaughn

makes it clear that a defendant must have a "purpose to

obstruct" to be guilty of contempt.  Id. at 1168.  This

requirement excludes all inadvertent violations that may result

from counsel's aggressive advocacy.  See id.  The facts of

Vaughn confirm this conclusion.

A district court held Smith, a city councilman, in contempt

for filing motions on behalf of his constituents and coming to

court to represent their concerns about alleged violations of a

consent decree.  Id. at 1161-62.  Smith was not an attorney,

making him ineligible to serve as his constituents'

representative in court.  Id. at 1161.  The Sixth Circuit found

all elements required for a contempt citation except intent.

Id. at 1168-69.  When Smith appeared in district court for the

hearing, he immediately clarified that he did not come to

"practice law" or act as his constituents' lawyer or

representative.  Id. at 1169.  Smith instead came to act as a

"witness" on their behalf.  Id.  The Sixth Circuit found that

Smith had no intent to obstruct the court or its proceedings and

reversed his conviction for criminal contempt.  Id.  To use the

Supreme Court's earlier formulation, because Smith's actions

were in good faith, a court could not find him in contempt.  Cf.

In re McConnell, 370 U.S. at 236; In re Watts, 190 U.S. at 29,

35.  Because any requirement of good faith is subsumed in the

requirement that there be proof beyond a reasonable doubt that the defendant intended to obstruct the court, Moncier's argument is moot.

## 2. Analysis of the elements under § 401(1)

The first element required for a conviction under 18 U.S.C. § 401(1) is proof that the defendant engaged in misbehavior. Here, this element is easily satisfied. Vaughn, 752 F.2d at 1167. The Court attempted to ask Vassar directly whether he wanted Moncier to continue to serve as his attorney. (Hearing Tr. at 106-07.) Moncier interrupted the Court to halt the questioning. The Court ordered Moncier to "be quiet." (Id. at 107:7.) Before the Court could utter another word, Moncier objected again. (Id. at 107:8.) The Court instructed Moncier to follow its prior direction "until Mr. Vassar answers this question." (Id. at 107:10.) Moncier once again refused to follow the Court's instructions and objected before the Court could say anything else. (Id. at 107:11-12.) The Court then issued an order of unmistakable clarity: "Mr. Moncier, one more word and you're going to jail." (Id. at 107:13-14.) Before the Court could say any more, Moncier interjected. (Id. at 107:15.) Three times the Court ordered Moncier to remain silent while it asked a question. Three times Moncier disobeyed. That is misbehavior.

The second element is that the misbehavior must obstruct justice. _Vaughn_, 752 F.2d at 1167. Acts that "interrupt the orderly process of the administration of justice, or thwart the judicial process" are obstructive. _Id._ (quoting _Warlick_, 742 F.2d at 116). This definition includes acts that delay the proceedings, cause more work for the judge, or induce error. _United States v. Ortlieb_, 274 F.3d 871, 876 (5th Cir. 2001). Moncier's repeated objections in the face of three orders to remain silent for the duration of a single question obstructed the proceedings. The effect of Moncier's repeated refusal to allow the Court to question his client was to prevent the Court from continuing with the hearing. The Court had determined that a potentially serious conflict existed because of Moncier's simultaneous representation of Vassar and Grooms. The Court could not continue unless Vassar waived that conflict. (Hearing Tr. at 106.) Because Moncier refused to allow the Court to receive Vassar's answer, Moncier single-handedly halted all proceedings. _Cf._ _Ortlieb_, 274 F.3d at 876 (holding that actual obstruction existed where the defendant's conduct "had an effect on the proceedings"). The government has proven the second element beyond a reasonable doubt.

The third element requires that the obstruction occur in the presence of the Court. _Vaughn_, 752 F.2d at 1167. There is no dispute that the events leading to the contempt citation

28

occurred in open court on November 17, 2006. The third element is satisfied.

The fourth and final element requires proof beyond a reasonable doubt that the defendant intended to obstruct the proceedings. Id. at 1167. At a minimum, the government must show that Moncier's actions were volitional and taken although he "kn[ew] or should reasonably be aware that his conduct [was] wrongful." Id. (quoting Seale, 461 F.2d at 368.) The transcript of the hearing is the "most obvious source from which intent can be ascertained." Ortlieb, 274 F.3d at 876 (citation omitted).

The most probative evidence here is the change that took place in the hearing once Vassar had vacillated about whether he wanted Moncier to continue as his attorney. (Hearing Tr. at 102.) Before that point, Moncier and the Court had engaged in several long colloquies, largely devoid of interruptions. (See id. at 1-102.) After Vassar wondered about whether he should keep Moncier as his attorney, Moncier interjected every time the Court sought to question Vassar directly. (See id. at 102-107.) Moncier interjected although he initially suggested that the Court question his client directly. (See, e.g., id. at 57, 70, 88-89.) When the Court sought to ask the pivotal question – whether Vassar wanted to keep Moncier as his counsel – Moncier

prevented Vassar from answering despite three orders to desist. (Id. at 106-07.)

Moncier argues that his final interjection, asking "May I speak to my – –," was an effort to seek clarification of the Court's order. (Def.'s Findings at 7.) Clarification of an ambiguous order may be appropriate; however, the cases Moncier cites for support all address civil, rather than criminal, contempt. See Satyam Computer Servs., Ltd. v. Venture Global Eng'g, LLC, 323 F. App'x 421, 430 (6th Cir. 2009); Star Fin. Servs., Inc. v. Aastar Mortg. Corp., 89 F.3d 5, 13 (1st Cir. 1996); Goya Foods, Inc. v. Unanue-Casal, 141 F. Supp. 2d. 207, 216 (D.P.R. 2001). Furthermore, there was no ambiguity in the Court's three separate orders that Moncier remain quiet while the Court questioned Vassar: "Mr. Moncier, you be quiet"; "You may stand there and do what I told you to do until Mr. Vassar answers this question"; "Mr. Moncier, one more word and you're going to jail." (Hearing Tr. at 107.) Three times, the Court instructed Moncier to say nothing. If ambiguity existed, the Court removed it with its third order: Moncier could not say a word about anything. (Id.) No reasonable person could read ambiguity into such an order. Instead, Moncier continued his prior actions: interjecting before the Court could say another word to Vassar. (Id. at 107:15.)

Although Moncier may have been ready to proceed with the sentencing hearing (Trial Tr. at 74), the record makes clear that Moncier refused to allow the Court to proceed with its chosen course of action: questioning his client. His repeated objections were deliberate, not inadvertent. The Court finds that the government has proven beyond a reasonable doubt that Moncier intended to obstruct the proceedings by preventing the Court from asking Vassar whether he wanted Moncier to continue as his counsel. Because the government has proven all four elements required for contempt under 18 U.S.C. § 401(1) beyond a reasonable doubt, the Court finds Moncier GUILTY of criminal contempt of court.

## B. Disobedience of a Lawful Order or Command

Alternatively, Moncier's actions implicate 18 U.S.C. § 401(3). Subsection three authorizes a court to hold a person in criminal contempt if he disobeys or resists a court's "lawful writ, process, order, rule, decree, or command." 18 U.S.C. § 401(3). This section has an "obvious meaning" that allows courts to punish criminally the willful refusal to obey a lawful command. Green v. United States, 356 U.S. 165, 172 (1958); Waste Conversion, Inc. v. Rollins Envt'l Servs., Inc., 893 F.2d 605, 609 (3d Cir. 1990) (en banc). To prove guilt under this subsection, the government must demonstrate beyond a reasonable that that 1) there was a clear order of the court; 2) the

31

defendant disobeyed the order; and 3) the disobedience was intentional. In re Smothers, 322 F.3d 438, 441-42 (6th Cir. 2003); United States v. Strickland, No. 89-3815, 1990 U.S. App. LEXIS 4571, at *4 (6th Cir. Mar. 27, 1989).

The three orders of the Court were clear: Moncier could not say "one more word." (Hearing Tr. at 107.) Moncier's disobedience is equally clear: he repeatedly refused to allow the Court to receive an answer to its question. (Id.) That disobedience was deliberate. As discussed above, Moncier did not want Vassar to answer the question without Moncier's having an opportunity to speak with Vassar privately, despite the Court's rejection of that request. (Trial Tr. at 60-62.) For these reasons, the government has proven each of the elements required by subsection three beyond a reasonable doubt, and Moncier is GUILTY of criminal contempt under subsection three. Cf. Cadorna v. City & County of Denver, Colo., 562 F. Supp. 2d 1302, 1303-04 (D. Colo. 2006) (finding attorney in criminal contempt of court under 18 U.S.C. § 401(1) & (3) for repeatedly interrupting the court despite multiple admonitions to stop).

### III.  CONCLUSION

Considering all of the evidence presented during the bench trial held on June 21-22, 2010, in Knoxville, Tennessee, the Court finds Herbert S. Moncier GUILTY of criminal contempt under 18 U.S.C. § 401(1) and (3). A sentencing hearing will be held

on Monday, February 7, 2011, at 9:30 AM in the United States

Courthouse in Knoxville, Tennessee.

So ordered this 8th day of November, 2010.


                              s/ Samuel H. Mays, Jr.
                              SAMUEL H. MAYS, JR.
                              UNITED STATES DISTRICT JUDGE